## THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **DAVID BARRETT YOUNG III, et al.,** | **CIVIL ACTION** |
| **v.** | |
| **DANIEL BOONE AREA SCHOOL DISTRICT, et al.** | **No. 24-4729** |

**Henry, J.** *s/CH*                                                                 **July 2, 2025**

## MEMORANDUM

This case results from the tragic death of a nine-year-old child by his own hand. In the aftermath, his bereaved parents (and their surviving child who was present at the time of the death) sued the school district, the police who investigated the child's death, and the school bus company. Across three motions, all defendants moved for dismissal of the complaint. In this opinion and the accompanying order, I address the motions by the Daniel Boone Area School District ("the District") and Daniel Boone Area Intermediate Center ("the School"), the Amity Township Police Department (ATPD), and Krise Transportation, Inc., respectively.

### I.    BACKGROUND

At this level, I accept the factual content of the complaint as true.[1] The following recitation includes both factual matter and some statements in the complaint that may, as discussed below, amount to conclusions asserted without supporting factual allegations. I nevertheless include them

---

[1] *See infra* § II. When I refer to the complaint (or "compl."), I mean the operative complaint as amended, filed at ECF 11.

here, because there is room for disagreement around whether they could suffice to permit some counts to proceed to discovery.

Roman Young was the child of David Barrett Young III and Michele Young, and the brother of C.Y, the minor plaintiff. Roman was nine years old when he died. At the start of the 2022 school year, he was attending the Daniel Boone Area Intermediate Center, a school in the Daniel Boone Area School District, which is headquartered in Birdsboro, Pennsylvania. With the start of the school year around that time, Roman was repeatedly bullied on the school bus. On the morning of September 7, 2025, a classmate punched him on the bus. Later that day he appeared at the school nurse's office in a severe state of distress, "psychiatrically and psychologically unstable, crying, and vomiting" due to the bullying that week. Compl. ¶ 24. His teacher also sent him to see his school guidance counselor, Jessica O'Rourke. Ms. O'Rourke returned him to his regular school environment afterward (rather than, for instance, admitting him for an assessment of his ongoing "acute mental and psychiatric crisis"). *Id*. ¶ 28. Someone at the school called home to report merely that Roman had "gotten sick" at lunch. *Id*. ¶ 30. Neither the school bus company nor anyone from the school contacted Roman's parents about concerns over his wellbeing relating to bullying.

The day after Roman's crisis at school, he was at home with his brother C.Y. when he died by suicide from a gunshot to the head.[2] Following Roman's death, his parents sought more information about his death, but they were rebuffed by the School and the District, including by Jessica O'Rourke, who refused to speak with the Youngs.

---

[2] I employ "died by suicide" or "suicide death" at the suggestion that they improve on common formulations like "committed suicide." *See Suicide Language*, SUICIDE PREVENTION ALLIANCE, https://www.suicidepreventionalliance.org/about-suicide/suicide-language/ [https://perma.cc/WV8V-3RFH] (last visited June 9, 2025). This is a formal convention and not meant to convey any opinion on the allegations. The death of a child is always a tragedy.

Around the same time, the Amity Township Police Department began an investigation of Roman's death. The detective assigned by ATPD was Shawn O'Rourke, who was guidance counselor Jessica O'Rourke's husband. ATPD knew of the relationship between Detective O'Rourke and the guidance counselor who saw Roman the day before his death, but "affirmatively decided to keep Detective O'Rourke involved in the investigation." *Id*. ¶ 40. Jessica O'Rourke "conspired" with ATPD to "conceal the obvious evidence of wrongdoing, negligence, and liability" of the school and school district in Roman's suicide death. *Id*. ¶ 44. The school and school district hired a law firm to send "threatening letters" to the plaintiffs and exclude them from school property, while also conspiring "to use" ATPD to follow, stop, harass, and threaten them. *Id*. ¶¶ 45–46.

The complaint does not include any allegations relating to the substance of ATPD's investigation. It does not address whether the police were investigating the bullying that led to Roman's distress or, what seems more likely, Roman's having accessed a gun and ammunition. It does not include any facts regarding what the police did, other than "follow, stop, harass, and threaten" the Youngs as a "course of conduct in an attempt to dissuade, scare, and prevent the plaintiffs from continuing to try to obtain information." *Id*. ¶ 46. The ATPD told the Youngs that it had not obtained any evidence that Roman had been bullied or mistreated prior to his death, but ATPD had obtained direct evidence including multiple eyewitness statements substantiating the same. *Id*. ¶ 48.

The Youngs allege that ATPD had the "policy, custom, and practice of refusing to acknowledge conflicts of interest in law enforcement investigations and failing to ensure impartiality of such investigations," *id*. ¶ 50, and that it failed to adhere to "constitutional standards for investigating incidents," *id*. ¶ 51. Similarly, they allege that the School and the District had

unconstitutional customs, policies, and practices regarding "assessment, investigation, and referral of students with suicidal ideations or at risk for suicide." *Id.* ¶ 52.

## II.  LEGAL FRAMEWORK

To survive a motion to dismiss under Rule 12(b)(6), the complaint must set forth facts that raise a plausible inference that the defendant inflicted a legally cognizable harm upon the plaintiff. *See Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009). "[S]tating . . . a claim requires a complaint with enough factual matter (taken as true) to suggest the required element. This does not impose a probability requirement at the pleading stage, but instead simply calls for enough facts to raise a reasonable expectation that discovery will reveal evidence of the necessary element." *Phillips v. Cnty. of Allegheny*, 515 F.3d 224, 234 (3d Cir. 2008) (quotation marks and citations omitted). The rule "does not permit dismissal of a well-pleaded complaint simply because it strikes a savvy judge that actual proof of those facts is improbable." *Id.* (quotation marks omitted).

## III.  THE POLICE DEPARTMENT'S MOTION

This section considers only the motion by, and the claims against, ATPD. I begin with the direct federal claims, then move to the state law torts and immunity. I then consider derivative claims under *Monell* and the Wrongful Death and Survival Acts.

### A.  State-Created Danger

ATPD first moves to dismiss the count of state-created danger under 42 U.S.C. § 1983. Typically, governmental actors are not liable for injuries caused by private actors. The "Due Process Clause imposes no affirmative duty to protect a citizen who is not in state custody." *Bright v. Westmoreland County*, 443 F.3d 276, 281 (3d Cir. 2006). A due process violation may nevertheless occur "when state authority is affirmatively employed in a manner that injures a citizen or renders

him 'more vulnerable to injury from another source than he or she would have been in the absence

of state intervention.'" *Id.* (quoting *Schieber v. City of Philadelphia*, 320 F.3d 409, 416 (3d Cir.

2003)). This has come to be known as the state-created danger doctrine. To recover under this

theory, the plaintiffs would need to show that:

> (1) the harm ultimately caused was foreseeable and fairly direct;
> (2) a state actor acted with a degree of culpability that shocks the conscience;
> (3) a relationship between the state and the plaintiff existed such that the plaintiff
> was a foreseeable victim of the defendant's acts, or a member of a discrete class
> of persons subjected to the potential harm brought about by the state's actions, as
> opposed to a member of the public in general; and
> (4) a state actor affirmatively used his authority in a way that created a danger to a
> citizen or rendered the citizen more vulnerable to danger than had the state not
> acted at all.

*Id.*

ATPD focuses its argument for dismissing the state-created danger claim on the harm to

Roman, but that is not the theory put forth by the Youngs. The substance of the Youngs' claim in

Count IV focuses on the harms to the plaintiffs themselves through the police investigation, which

they contend harassed Roman's parents and brother. Nearly all of ATPD's motion fails to address

this. *See, e.g.*, ECF 21-1 at 9 ("no facts demonstrating actual knowledge or an awareness of risk

beforehand that is sufficiently concrete to have put ATD *on notice that Roman would take his life*."

(emphasis altered)), *id.* at 10 ("no way for ATPD to know that, by determining if Roman was

bullied at the request of Plaintiffs, it was somehow placing Plaintiffs at risk"); *id.* at 11 (Plaintiffs

"merely allege that ATPD failed to act."). Although the Youngs pointed this out in response, ATPD

did not address the real focus of their state-created danger argument in its reply or move to amend

its motion.

One ATPD argument on this point that does nevertheless address the Youngs' theory is that

the Complaint is insufficiently specific as to how or when police "harassed or followed" the Plain-

tiffs. ECF 21-1 at 11. The Youngs concede that they are required to plead affirmative conduct

(rather than mere failures to act), but they cite *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005), for the proposition that "[p]laintiffs are not required to plead a state-created danger claim *with specificity* to survive a motion to dismiss under Rule 12(b)(6)." ECF 27 at 13 (emphasis mine). To clear the low bar they set for themselves, they cite variously ¶¶ 43–44, 46, 48, and 93–106 of their Complaint, which repeatedly recite that ATPD, *e.g.*, "affirmatively, intentionally, repeatedly, and knowingly harassed plaintiffs," ¶ 95, "affirmatively utilized its law enforcement officers to follow, stalk, and harass plaintiffs," ¶ 96, "affirmatively used its authority to lie to plaintiffs about the findings," ¶ 97, "affirmatively misused its authority to pervert the investigation," ¶ 98, and "affirmatively misused its authority to employ tactics and methods to investigate the death." The pleadings offer very few instances of specific conduct done by ATPD. Thus, although it includes the allegation that ATPD "harassed plaintiffs," ¶ 95, it does not offer information on what constituted the alleged harassment. So too with the accused stalking and following.

"[I]n light of *Twombly*, Rule 8(a)(2) requires a 'showing' rather than a blanket assertion of an entitlement to relief." *Phillips*, 515 F.3d 224, 231. The Youngs' cited case *Hedges* is an admiralty case that determined that a particular issue of tolling was non-jurisdictional and therefore subject to the Rule 12(b)(6) standard, but it did not concern the required specificity of pleadings under that standard. 404 F.3d at 750. *Hedges* was also decided in 2005, prior to *Iqbal* and *Phillips*, the decisions that substantially changed the prior pleading standard—and decision that the Youngs cite directly in their own standards section. ECF 21-1 at 6. As the Youngs concede parenthetically, the Court is not "compelled to accept unsupported conclusions . . . or a legal conclusion couched as a factual allegation." ECF 21-1 at 6 (citing *Castleberry v. STI Grp.*, 863 F.3d 259, 263 (3d Cir. 2017)).

The complaint includes an array of legal conclusions "couched as" factual allegations that insufficiently *show* the entitlement to relief through allegations of fact, just as quoted above. *Id.* Many of these rely on the use of the word "affirmatively" to bolster their conclusions or fit them more clearly into the fourth element of state-created danger. In each of the quotations above taken from ¶¶ 95–98, a legal conclusion is accompanied by that word, rather than facts "showing" the conclusion under Rule 8(a). It is not that there are no well-pleaded facts that could be relevant to the conduct of the police, but these facts allege tortious behavior by the police itself, not a state-created danger. They fail to plausibly raise the inference that the ATPD created a cognizable harm by a third party, the danger thereof having been the fault of the police.

For instance, the Complaint adequately pleads that the police falsely told the Youngs that there was no evidence that Roman was bullied before his death, despite having received multiple eyewitness statements. Compl. ¶ 48. It adequately pleads that the police intended by misrepresenting their investigation to prevent the Youngs from learning damaging information about the school defendants, where Detective O'Rourke's wife worked, to try to protect her and her workplace from liability. *Id.* ¶ 49. But none of that indicates affirmative conduct that "in a way that created a danger to the citizen or that rendered the citizen more vulnerable to danger than had the state not acted at all." *Bright*, 443 F.3d at 281. The facts alleged raise the inference that Detective O'Rourke instructed his wife Jessica O'Rourke not to speak with the Youngs. *See* Compl. ¶¶ 48–50. But the Youngs have not explained what cognizable harm that caused, nor how it would shock the conscience. The Complaint is silent as to any particular information the Youngs were unable to obtain due to ATPD's allegedly telling school officials not to cooperate with their private investigation, or how lacking that information caused them harm. I do not here rule that such a thing is

inconceivable, only that it is not reasonably inferred from the factual content of the Complaint.[3] I therefore dismiss Count IV without prejudice.

### B.  Malicious Prosecution

ATPD moves to dismiss Count XV, in which the Youngs accuse it of malicious prosecution under the Fourth Amendment. The Youngs cite *Thompson v. Clark*, a Supreme Court decision that recognized this cause of action and held that it may lie even where there is no exoneration at the end of the misbegotten prosecution. 596 U.S. 36, 43 (2022). The "gravamen" of such a claim "is the wrongful initiation of charges without probable cause." *Id.* ATPD object that there simply was no "initiation of charges," and therefore no malicious prosecution about which to object. The Youngs rely on *Thompson*'s characterization of the first element of such an action, that "a suit or proceeding was instituted without any probable cause," emphasizing the term "proceeding." *Id.* at 44 (quotation marks and citations omitted). But *Thompson* was not concerned with that element, and the plaintiffs do not offer any authorities or argument on why "proceedings" should be interpreted to include police investigation that does not result in the filing of charges. This is particularly concerning where *Thompson* itself notes that, "[b]ecause this claim is housed in the Fourth Amendment, the plaintiff also *has to prove that the malicious prosecution resulted in a seizure* of the plaintiff." *Id.* n.2 (emphasis added).

---

[3] It is easy to understand and sympathize with the desperation of bereaved parents to understand their child's recent death. I am nevertheless unaware of any right the Youngs had to speak with or get information from Ms. O'Rourke or other school officials.

I also recognize that, because ATPD's memorandum mostly failed to address the Youngs' theory on this point, the Youngs had imperfect notice of what points might assist my consideration of the present motion. Although I grant the motion on this count, I also grant leave to amend the complaint.

The allegations in the Complaint on this matter repeatedly assert that ATPD initiated a criminal proceeding, but they do not offer factual content to permit the inference. For instance, there is no allegation that any of the Youngs were arrested or asked to surrender, indicted, given a case docket number or a court date, read *Miranda* warnings, or otherwise involved in a proceeding beyond police investigation. Similarly, there are no allegations indicating a seizure sufficient to state a claim under the Fourth Amendment. Since the Youngs offer no authority holding or suggesting that mere investigation may suffice to make out a "proceeding" in this context, I dismiss Count XV without prejudice.

### C.  State Law Torts and Immunity

ATPD argues that the state law torts are barred by Pennsylvania's Political Subdivision Tort Claims Act (PSTCA), which generally confers immunity from civil liability to local governmental agencies. Two counts allege negligence by the department: Count VIII for "negligence/recklessness/actual malice/willful misconduct" and Count XI for negligent infliction of emotional distress (NIED). Three allege reckless or intentional torts: Count X for intentional infliction of emotional distress (IIED), Count XIII for fraud, and Count VIII again, since it offers both theories.

The parties agree that this Court is bound by state law as to whether the immunity applies and that ATPD is a "local agency" covered by PSTCA, but the Youngs argue that exceptions to this immunity save at least some of the counts. PSTCA generally makes local agencies immune from suit for "damages on account of any injury to a person or property caused by any act of the local agency or an employee thereof or any other person." 42 Pa. C.S. § 8541. Although the same subchapter contains a section excepting negligence suits from that general rule, that section relates only to enumerated categories of claims that are not relevant here. *Id.* § 8542. As to the negligent torts, the Youngs offer no argument that they fall within those categories.

Instead, the Youngs rely on a further exception in the PSTCA under § 8550. Here is the full text of that section, titled "Willful Misconduct":

> In any action against a local agency or employee thereof for damages on account of an injury caused by the act of the employee in which it is judicially determined that the act of the employee caused the injury and that such act constituted a crime, actual fraud, actual malice or willful misconduct, the provisions of sections 8545 (relating to official liability generally), 8546 (relating to defense of official immunity), 8548 (relating to indemnity) and 8549 (relating to limitation on damages) shall not apply.

42 Pa.C.S. § 8550. The Youngs argue that this section "removes the cloak of immunity from local agencies," apparently for not only whatever claims involved that willful misconduct, but perhaps for other claims within the same suit as well. ECF 27 at 20. That remedy does not appear in the statute, nor does it seem to be a likely interpretation. The text only provides that where it is "judicially determined" that an employee's acts were criminal, actually fraudulent, or willful misconduct, the other listed statutes "shall not apply." 42 Pa.C.S. § 8550. Critically, each of those listed statutes concerns only to suits against *officials*, rather than agencies. *Id.* (describing each section)*; id.* § 8545 (providing liability for local agency employees in general only where agency is itself liable), 8546 (providing defenses in suit against local agency employee), 8548 (regarding indemnification of local agency employees), 8549 (limiting damages in action against local agency employee).[4] Missing from the same enumeration are the two sections that discuss immunity against agencies, §§ 8541 and 8542, which includes the one specifically cited by ATPD. The Youngs do not offer any reason why I should read §§ 8541–42 into a list that does not include them. *See United States v. Nasir*, 17 F.4th 459, 471–2 (3d Cir. 2021) (where law explicitly lists some statutes

---

[4] Directly between these four statutes but not included in the list is 42 Pa.C.S. § 8547, which covers legal assistance to a local agency employee whose alleged acts were within the scope of her duties. This section includes its own discussion of how a local agency should handle an employee's "crime, actual fraud, actual malice or willful misconduct." *Id.*

but not others, interpretive canon of *expressio unius* counsels courts to accord weight to the exclusion). The only authority offered by the Youngs on that point is *Udujih v. City of Phila.*, 513 F. Supp. 2d 350 (E.D. Pa. 2007), in which a plaintiff sued both the Philadelphia Police Department and individual named employees. Yet in *Udujih*'s own brief discussion as to this question, the court dismissed the charges against the department under PSTCA precisely because, again, §§ 8545–50 apply only to suits against individual employees. *Id.* at 358 ("[W]hile the Tort Claims Act does abrogate immunity for individual employees who commit intentional torts, such abrogation does not extend to the municipality."). I therefore hold that PSTCA confers immunity on ATPD from the present state law claims, and I dismiss Counts VIII, X, XI, and XIII with prejudice.

### D.  *Monell* claims as to Unlawful Custom or Policy and Failure to Train

ATPD also move to dismiss Counts V and VI, which accuse the department of unlawful and deliberately indifferent customs, practices and policies and failure to properly train staff. A *Monell* claim is derivative of a constitutional claim in the sense that it cannot survive if there was no underlying constitutional violation. *See Los Angeles v. Heller*, 475 U.S. 796, 799 (1986); *Santiago v. Warminster Twp.*, 629 F.3d 121, 135 (3d Cir. 2010). In the present case, because I have dismissed the underlying claim without prejudice, I also dismiss the *Monell* claim in Counts V and VI without prejudice.

### E.  The Wrongful Death and Survival Acts

Finally, the Youngs sue ATPD under Pennsylvania's Wrongful Death Act, 42 Pa.C.S. § 8301, and Survival Act, *id.* § 8302. These statutes offer limited avenues for a decedent's beneficiaries or estate to maintain an action that the decedent could otherwise have brought. They are derivative of the underlying tortious acts that cause the fatal injury, and they too cannot survive where the underlying claims fail. *Sunderland v. R.A. Barlow Homebuilders*, 791 A.2d 384, 390–

91 (Pa. Super. 2002), *aff'd*, 576 Pa. 22 (2003); *Johnson v. City of Philadelphia*, 105 F. Supp. 3d 474, 483 (E.D. Pa. 2015), *aff'd*, 837 F.3d 343, 354 & n.58 (3d Cir. 2016). In the present case, because I have dismissed the underlying claims without prejudice, I also dismiss the Wrongful Death and Survival claims as to ATPD without prejudice.

## IV.  THE SCHOOL DEFENDANTS' MOTION

This section considers only the motion by the School and the District. Although my analysis substantially overlaps on the matters of state tort immunity, *Monell*, and wrongful death and survival, the analysis under § 1983 here is a much closer call.

### A.  Amenability of the School to Suit

As a preliminary, the School argues that it cannot be sued because it is "merely a subdivision[] of the School District," citing *Haney-Filippone v. Agora Cyber Charter Sch.* for the proposition that "[a] public school is merely a subdivision of a school district and lacks the capacity to sue or to be sued." ECF 24-1 at 6 (citing 538 F.Supp.3d 490, 497–98 (E.D. Pa. 2021)). The Youngs do not respond to this argument. I note that *Haney-Filippone* is not on point, since it refers only to what agencies may be sued under the federal Labor Code and Family Medical Leave Act. 538 F.Supp.3d at 497–98. Regardless, given that the Youngs' response repeatedly refers only to the District, it apparently concedes that the School is not a legal entity separate from the District. *See Estate of Massey v. City of Phila.*, 118 F. Supp. 3d 679, 699 (E.D. Pa. 2015). I therefore grant the motion and dismiss all counts against the School without prejudice.

### B.  Section 1983: Special Relationships and State-Created Danger

The District moves to dismiss the count under 42 U.S.C. § 1983. As discussed above, governmental actors are typically not liable for injuries caused by private actors. *DeShaney*, 489 U.S.

12

at 198-200. Two doctrines nevertheless provide exceptions to that rule: The "special relationship" of some plaintiffs to the state, and a "state-created danger."

It is clear that neither the plaintiffs nor Roman could claim a "special relationship" existed with the District. A relationship with the government can be "special" in the sense that the government has an affirmative duty to, for instance, provide medical care and ensure a person's safety. This is the case with incarcerated prisoners, *see Estelle v. Gamble*, 429 U.S. 97, 103 (1976), and involuntarily committed mental patients, *Youngberg v. Romeo,* 457 U.S. 307, 324 (1982). Yet, the Third Circuit has left little room for such a relationship between a school and its student. *Morrow v. Balaski*, 719 F.3d 160, 170 (3d Cir. 2013) (*en banc*), *as amended* (June 14, 2013). As a general matter, public schools "do not have a constitutional duty to protect students from private actors." *Id*. (emphasis omitted). *Morrow* did leave aside room for special situations in which a school's authority over a student substantiated "the type of physical custody necessary to bring it within" a special relationship and the attendant constitutional protections. *Id.* at 168. Despite asserting such a special relationship, the factual content of the complaint does not include allegations of an arrangement that made his time at school more like time in government custody. *See* compl. ¶ 68. The Youngs evidently concede as much, offering no argument regarding special relationship in their briefing.

The focus instead is on whether the District created a danger that harmed the Youngs. Like ATPD, the District argues principally on the requirement that such a claim show an affirmative act rather than merely passive inaction. *See Phillips*, 515 F.3d at 235 (emphasis original). The Third Circuit has noted that distinguishing between action and inaction by a defendant can be difficult. *Morrow*, 719 F.3d at 177–78. But it is instructive that the requirement "serves to distinguish cases where officials might have done more from cases where officials created or increased the risk

itself." *Id.* at 179 (cleaned up). Where the Third Circuit has drawn lines indicates that the present alleged District conduct is not "affirmative" under the fourth *Bright* element. *See supra* § III.A. For instance, in *Morrow* itself, the Third Circuit held that a school's allowing a known bully to return from a suspension, which was effectively its decision not to expel her, did "not suggest an affirmative act." *Id.* at 178. Neither was the school's permitting the bully to board the plaintiffs' school bus in violation of a stay-away order *affirmative*, since the violation was the bully's and not the school's. *Id.* Similarly, in *G.S. v. Penn-Trafford Sch. Dist.*, a child who was repeatedly bullied and reported it to school authorities was warned by an assistant principal that she would lose the coming fight with the bully, was then severely beaten at school, and was then herself suspended. 813 F. App'x 799, 800–01 (3d Cir. 2020). Although the panel allowed that the assistant principal's discussing the plaintiff's accusations with the bully prior to the fight were affirmative actions, it nevertheless found that they were insufficiently causal of the harm—despite the harmful fight occurring practically right afterward. *Id.* at 802–03 (ruling that the assistant principal's statement was not harmful and that it was "entirely speculative" to infer that it was related to the fight).

The Youngs raise an important example where the Third Circuit affirmed the denial of dismissal in a state-created danger case dealing with the administration of a school. In *L.R. v. School District of Philadelphia*, a man arrived at a kindergarten classroom and asked her teacher to release one the class's girls to him. 836 F.3d 265, 239–40 (3d Cir. 2016). The teacher asked the man for identification and proof that the girl had permission to leave, neither of which he produced. *Id.* The teacher nevertheless released the girl, who went with the strange man off school grounds and was thereafter sexually assaulted by him. *Id.* In discussing whether the teacher's actions were sufficiently affirmative, the court encouraged "first evaluat[ing] the setting or the 'status quo' of the environment before the alleged act or omission occurred, and then [asking] whether the state

actor's exercise of authority resulted in a departure from that status quo." *Id*. at 243 (citing *Bright*, 443 F.3d at 281). Under the circumstances, the court observed that permitting a kindergartner to leave the classroom represented a massive change in the status quo because a kindergarten class-room is a closely protected and safe space. *Id*. It therefore distinguished *Morrow*, in which the status quo, or the return to the status quo when the bully returned to school, was preserved. *Id*. at 243–44. The court identified that when a state actor has substantial authority and "hand[s] over their responsibility to a private actor who, under the circumstances, posed an obvious risk," it acts affirmatively. *Id*. at 244 (citing *Horton v. Flenory*, 889 F.2d 454 (3d Cir. 1989)).

It is not necessary for state-created danger that some responsibility be given over by the government to a private actor like the *L.R.* assailant. Instead, it may essentially be taken away from a person caring for someone who cannot care for herself. In *Kneipp v. Tedder*, the case in which it upheld a state-created danger theory for the first time, the Third Circuit considered police officers who stopped a couple walking home and only a third of a block from their apartment. 95 F.3d 1199, 1201 (3d Cir. 1996). Samantha Kneipp wanted to keep drinking, but she was badly drunk already, struggling to walk and smelling of urine, and her argument with her husband Joseph about it was making a disturbance. *Id*. & n.2. Police stopped them and interviewed them separately, then allowed Joseph to leave the scene to attend to the young child at home with the babysitter. *Id*. at 1201–02. Samantha was still in a police car when Joseph left, and given her state, he presumed police would deliver her either to the hospital or the lockup. *Id*. at 1202. Instead, police released her into the cold night. *Id*. She was found unconscious in an embankment later that night, and her exposure to the cold resulted in hypothermia and extensive brain damage. *Id*. at 1203 & n.16. Considering the police actions dealing with someone so intoxicated, the court reasoned that it was at least "conceivable that, but for the intervention of the police, Joseph would have continued to

15

escort his wife back to their apartment where she would have been safe" and therefore the fourth element obtained. *Id.* at 1209.

With these decisions in mind, the lion's share of actions attributable to the District in the present complaint cannot amount to affirmative actions. As the Youngs themselves allege, the District did essentially nothing with its alleged knowledge of Roman's being bullied, instead continuing to put him on the bus home "day after day." Compl. ¶ 72. Although Roman was seen by the school nurse and the guidance counselor, he was returned to class and put on the bus home.[5] Things proceeded as normal, *i.e.*, the status quo. Because there was simply no intervention and no reporting, under the case law, there is very little room to infer liability where school officials could have done more but did not. The District's refusal to cooperate with the Youngs' investigation into Roman's death was similarly not an affirmative act but a passive inaction.

One action potentially attributable to the District stands out: The misinformation given by school authorities to the Youngs about Roman's episode the day before his death. The factual content pleaded here is thin, but sometime on September 7, someone at the school called Roman's mother and told her "merely that [Roman] had 'gotten sick' at lunch." Compl. ¶ 30. The caller "affirmatively misrepresented the mental state that Roman was in, and also affirmatively concealed from Roman's parents the abuse, harassment, and bullying that Roman had been enduring at school

---

[5] I do not rule that the school did nothing that could have been an affirmative action. I rule only that sufficient facts are not pleaded at this time. For instance, the school nurse and the guidance counselor are alleged to have encountered Roman, a nine-year-old child, in a state of severe and acute psychological distress and to have known that he was at imminent risk of self-harm. Under such circumstances, their merely returning Roman to his classroom could be taken to resemble the teacher's action of permitting L.R. to leave kindergarten with a strange man. *See also Spruill v. School District of Philadelphia*, 569 F. Supp.3d 253, 264–65 (E.D. Pa. 2021) (denying dismissal where complaint pleaded school *created* a "completely toxic, hostile, and dangerous school environment," while aware of the child's bullying, pre-existing disability, and history of depression and "reactive disruptive behavior"). But the Third Circuit's decisions indicate that, in general, returning Roman to the classroom would not have been an affirmative action.

and on the bus which the defendants knew about," *id.* ¶ 30, concealing the far more extreme epi-sode that had unfolded including "obvious signs of acute psychological distress," *id.* ¶¶ 24, 27.

The inference that the Youngs assert is that "[h]ad these defendants not misused their au-thority in this manner, Roman Young would be alive today." *Id.* ¶ 71. That could be true, but there is not enough factual matter on this point to "nudge[] . . . the assertion from conceivable to plau-sible." *Iqbal*, 556 U.S. at 680. The question is whether something about the misrepresentation made to Roman's parents worsened the risk of Roman's death, whether it changed the status quo. Nothing is alleged about whether the caller indicated (through words or otherwise) that there was nothing to worry about, rather than *failing to indicate* that there were behaviors to worry about. Nothing is alleged about whether Roman's parents were otherwise aware of his being bullied or severely troubled—if, for instance, they had plans to more closely supervise Roman or get him treatment, but then canceled those plans relying on the misrepresentation. Each of these could support the inference that they scaled back their own close attention to Roman based on hearing that everything was fine at school (beyond a stomach ache). Barring those facts, although the Youngs claim that "[h]ad these defendants not misused their authority in this manner, Roman Young would be alive today," I find that the complaint presently leaves this to speculation. Alt-hough *Murrill* and *G.S.* indicate a narrow set of facts that could suffice to state a due process claim, because I believe there is a possibility under *L.R.* and *Kneipp* of additional pleading that would permit the issue to go forward, I will permit amendment.

## C.  State Law Torts and Immunity

As with ATPD's motion, the District moves to dismiss the state law torts are barred by PSTCA. *See supra* § III.C. As with their response to ATPD, the Youngs counter that 42 Pa.C.S. § 8550 provides an exception from immunity for willful misconduct. And as in my previous

discussion, I hold that PSTCA does confer immunity on the agency for the relevant state law claims, so I dismiss Counts VII, XI, XII, and XIV with prejudice. *See Udujih*, 513 F. Supp. 2d at 358.[6]

### D. *Monell* claims as to Unlawful Custom or Policy and Failure to Train

As with ATPD's motion, the District moves to dismiss the *Monell* claims, which accuse it of unlawful and deliberately indifferent customs, practices and policies and failure to properly train staff. *See supra* § III.D. Such claims are derivative in the sense that they cannot survive if there was no underlying violation. *See Heller*, 475 U.S. at 799; *Santiago v. Warminster Twp.*, 629 F.3d 121, 135 (3d Cir. 2010). Because I dismiss the underlying claims without prejudice, I dismiss the *Monell* claims without prejudice as well.

### E. The Wrongful Death and Survival Acts

The Youngs sue the District under Pennsylvania's Wrongful Death Act, 42 Pa.C.S. § 8301, and Survival Act, *id.* § 8302. These actions are derivative of the underlying tortious acts that cause the fatal injury, and they too cannot survive where the underlying claims fail. *See supra* § III.E. Because I dismiss the underlying claims without prejudice, I dismiss the Wrongful Death and Survival claims without prejudice as to the District.

### F. Punitive Damages

Finally, the District moves to dismiss the Youngs' claim for punitive damages. As I grant the motion to dismiss all counts, I need not reach this issue.[7]

---

[6] Because I rule that the District is immune regarding Count XI for NIED and Count XIV for civil conspiracy, I do not reach the District's arguments that these claims fail on other grounds.

[7] Anticipating that the Youngs may seek to amend, I will note that I would grant the District's motion as to punitive damages. The District cites *City of Newport v. Fact Concerts, Inc.*, 453 U.S. 247, 263 (1981), which held that punitive damages are unavailable against a municipality

## V.  <u>THE SCHOOL BUS COMPANY'S MOTION</u>

Finally, I consider the motion by Krise Transportation to dismiss. Krise filed a motion to dismiss 1) for failure to join a necessary party under Rule 12(b)(7) and Rule 19 (evidently relating to all counts against it), 2) for failure to state a claim on which relief can be granted under Rule 12(b)(6) as to Count XI, 3) regarding punitive damages generally, and 4) regarding a paragraph of Count IX on negligence by spoliation.

When a defendant moves under Rule 12(b)(7) for lack of a necessary party, a court applies the standards of Rule 19. Where the indispensable party cannot be joined, the remedy may be dismissal. *Epsilon Energy USA, Inc. v. Chesapeake Appalachia, LLC*, 80 F.4th 223, 232 (3d Cir. 2023); *Farmers Ins. Co. of Oregon v. Hopkins*, 2011 WL 1667581 (D. Nev. 2011) (dismissal can be proper only if joinder is not feasible). Where they can be joined and the parties do not do it themselves, the court "must order that the person be made a party." Fed. R. Civ. P. 19(a)(2).

Krise argues that "the Court cannot accord complete relief" because the alleged minor tortfeasor(s), *i.e.*, the "school bus bully," would not be "subject to apportionment of any potential liability." ECF 18-2 at 4. This is "particularly relevant," it argues, given that some of the claims arise under negligence. *Id.* Yet Krise itself argues that the alleged tortfeasor would be subject to this Court's jurisdiction, so even if it were right about joinder, the remedy of dismissal would not appropriate. *Id.* at 2 (quoting Fed. R. Civ. P. 19(a)(1), "person who is subject to service of process

---

under § 1983 since that was unavailable at common law when section was enacted. It further cites a section of the PSTCA that limits provides an enumerated types of damages available against a government or official and which does not include punitive or exemplary damages or offer a savings clause. 42 Pa.C.S. § 8553(c) ("Damages shall be recoverable only for . . ."); *see Nasir*, 17 F.4th at 471–2 (interpretive canon of *expressio unius* counsels against reading in items not enumerated in a list.). The Youngs offer substantial argument on why punitive damages should be made available, but they offer no argument against the application of *City of Newport* and § 8553(c) to foreclose punitive damages as a matter of law.

. . . must be *joined as a party*" (emphasis provided)). I am unpersuaded by its brief argument with-

out authorities as to the tortfeasor's indispensability, given that Count IX does not appear to suggest

that liability could be shared with the tortfeasor, however I leave that decision aside until Krise

moves under, for instance, Rules 13(h) or 14. *See Republic of Philippines v. Pimentel*, 553 U.S.

851, 862–63 (2008) (design of Rule 19 "indicates that the determination whether to proceed will

turn upon factors that are case specific").

Krise next moves to dismiss Count XI based on case law that proscribes negligent infliction

of emotional distress (NIED). Krise notes that a plaintiff alleging NIED must have "suffer[ed]

immediate and substantial physical harm." ECF 18-2 at 5. That somewhat exaggerates Pennsylva-

nia law, which permits recovery even where the only immediate physical response was sudden loss

of continence. *Armstrong v. Paoli Memorial Hosp.*, 633 A.2d 605, 609 (Pa. Super. 1993). Plaintiffs

counter by citing ¶ 151 of the complaint, which pleads that the minor plaintiff C.Y.'s "personal and

contemporaneous observation of his brother . . . in a pool of blood suffering from and eventually

dying from a self-inflicted gunshot wound" caused psychological and emotional harm, "which has

manifested itself physically." The alleged scene is heartbreaking, however the legal question per-

tains specifically to whether the final five words are adequate factual matter. Under similar cir-

cumstances, I would likely find this statement to merely rehearse a legal conclusion without ade-

quately "showing" the minor's entitlement to relief. Fed. R. Civ. P. 8(a)(2); *see Phillips*, 515 F.3d

at 234. Here, however, I note that the averment by the minor plaintiff and his parents voluntarily

opens him to the task (and perhaps added trauma) of a deposition on the topic, and I consider that

discovery is sufficiently likely to bear out further evidence.

Krise next argues that because C.Y. was not "in the zone of danger when the minor took

his [own] life," he cannot recover. Pennsylvania does not require that a close relative like a brother

be within the zone of danger. *Sinn v. Burd*, 486 Pa. 146, 155–57 & n.6 (1979). Where a parent learned of her daughter's fatal injury and arrived on the scene minutes later, the Pennsylvania Supreme Court denied relief. *Mazzagatti v. Everingham by Everingham*, 512 Pa. 266, 279 (1986). It based that opinion, however, on two relevant criteria of foreseeability: "(1) Whether plaintiff was *located near the scene of the accident* as contrasted with one who was a distance away from it; [and] (2) Whether the shock *resulted from a direct emotional impact upon plaintiff from the sensory and contemporaneous observance of the accident,* as contrasted with learning of the accident from others after its occurrence." *Id.* (citation omitted, emphasis preserved). Given that C.Y. was at home with his brother at the time of the shooting and personally observed his brother's lying in a pool of blood and death, he was sufficiently proximate for these purposes.[8]

Krise next moves to dismiss because the Plaintiffs "have failed to state a claim upon which relief may be granted *for punitive damages*" (header restyled). Generally, the availability of punitive damages is often not resolved on a motion to dismiss because it is "an inherently factual inquiry." *Greenwald Caterers Inc. v. Lancaster Host, LLC*, 599 F. Supp. 3d 235, 248 (E.D. Pa. 2022). Further, Pennsylvania pleading requirements do not control in federal court, where it may not even be necessary to plead punitive damage in the complaint insofar as there is not any issue of notice before trial. *Bowles v. Osmose Utilities Servs., Inc.*, 443 F.3d 671, 675 (8th Cir. 2006).

Finally, Krise moves to dismiss a paragraph within Count IX alleging negligence by "[s]poliation, destruction, and alteration of evidence, including video footage on the bus[.]" ¶ 135y. It offers *Pyeritz v. Com.*, 613 Pa. 80, 88 (2011), in which the Pennsylvania Supreme Court held that negligent spoliation of evidence does not make out a tort. Parties or courts may propose alternative

---

[8] Krise argues only that C.Y. did not allege being "present or in the zone of danger when the minor took his life." ECF 18-2 at 5. Krise does not argue, and I do not here rule on, whether Roman's death was itself unforeseeable as relates to what happened on the bus.

sanctions where spoliation, including intentional spoliation, is indicated. *Id.* Nevertheless, it is, in the main, unavailable. I grant the motion to dismiss Count IX only as to the allegation of negligence by spoliation of evidence.

## VI.  <u>CONCLUSION</u>

For the reasons above, I am issuing an order that grants ATPD's, the School's, and the District's motions to dismiss as to all counts, and which grants in part and denies in part Krise's motion to dismiss. The Youngs request that I permit them leave to amend the complaint again. With the proviso that the above discussion indicates that much of the deficiency may be unlikely to be cured, I will permit the amendment.